Dwight L. LONG, Plaintiff-Respondent,

v.

George W. MANNING and Jeanne Manning,
Defendants-Appellants,

v.

The CAMERON SAVINGS & LOAN ASSOCI-
ATION and Frank L. Pulley, Third-
Party Defendants-Respondents.

No. 54385.

Supreme Court of Missouri,
Division No. 2.

June 8, 1970.

Motion for Rehearing or to Transfer to Court
En Banc Denied July 13, 1970.

Beavers, Thomson & Beavers, Maryville, Fred Kling, Albany, for respondent, Dwight L. Long.

Robison & Miller, Maysville, for respondents, The Cameron Savings and Loan Association and Frank L. Pulley.

Pickett, Andereck, Hauck & Sharp, Eugene E. Andereck, Trenton, Robert B. Loman, Bethany, for appellant.

HENRY I. EAGER, Special Commissioner.

This suit was filed in two counts (1) for the recovery of possession of certain real estate in Gentry County with rents and profits and (2) that title thereto be adjudged in plaintiff. The defendants, Manning and his wife, filed their answer and counterclaim, and also their third-party petition against Cameron Savings & Loan Association and Frank L. Pulley. The third-party defendants filed answers. Plaintiff later filed an amended petition to which defendants' answer was not refiled, but since the case was tried as though it had been, we shall consider that it was. The pleadings are rather lengthy, and the claims of the parties will be sufficiently demonstrated by our review of the evidence and our discussion of the various conflicting claims. There is no contention here of the insufficiency of any pleading. The property in question was sold at foreclosure sale on October 7, 1966, and plaintiff was declared to be the successful bidder. The Mannings dispute the validity and effect of the sale. The trial court found against them and adjudged the title and the right of possession to be in plaintiff. The issues will be described further a little later.

On July 3, 1962, defendants George W. Manning and Jeanne Manning, his wife, executed a promissory note payable to Cameron Savings & Loan Association for $31,786.79 at 6½% interest, with principal and interest to be payable at the rate of $277.18 on the first day of each month, and with interest after maturity at 8%; the note contained an acceleration provision effective upon default in any instalment at the option of the holder; permission was given to prepay any part of the principal in advance upon paying an additional 1% of the payment so made. This note was secured by a deed of trust in the usual form in which Frank L. Pulley was named as trustee; the grantors therein agreed to keep the property insured for the original amount of the note and to pay all taxes. The property was in Albany, Missouri, and the improvements consisted of apartments or dwellings converted into rental space. The detail of this is immaterial.

The primary controversies concern the number and amount of payments made on the note, and their application, and also the validity of the sale. Both the account book held by the Mannings and the loan ledger account of Cameron (as we shall designate it for convenience) were in evidence; Cameron had made all the entries in the Manning book, generally at the times when the same entries were made in its account. The monthly payments were actually fixed by agreement at $325 so as to include the amounts necessary for insurance and taxes, and they were paid on that basis. For a certain period beginning in July, 1962, Cameron was authorized to and did draw drafts on Manning's account in an Albany bank to cover the payments.

The record does not show specifically why this practice ceased, but one or more of the drafts were shown to have been unpaid, and the records indicate that during the course of the loan six instalment payments, made by check or draft, were charged back to the loan account; we may fairly infer that these were payments which did not clear the bank. It will be impossible to follow the various payments over a period of approximately four years. The payments were frequently, if not usually, late; even the drafts were not drawn promptly on the first of the month. Cameron frequently communicated with Manning about overdue payments. The ledger account carried charges not only for interest but also for other accruals such as insurance and taxes and it showed the total balance due after each instalment payment. The last payment shown on the ledger account was on June 30, 1966, and in fact Manning's book does not show that one (presumably because of failure to send the book in).

There is little or no argument about the amounts actually paid. There is a disagreement concerning the application of at least two payments. In March, 1964, Manning wrote concerning the return of a check or draft for "not sufficient funds" but explained that he had started a separate account and that drafts should be drawn on that. In September, 1965, Cameron required that all payments be made by bank draft or money order not later than the 10th of the month, and in October complained (by letter) that only one of two promised payments had been made, and that two were then due; at that time it stated that a failure to make these payments by draft or money order by October 20, would make it necessary that it declare the entire note to be due. At that time it returned a bank draft for one payment, because *two* had been promised. On November 29, 1965, Manning wrote that if his plans worked out he would wish to pay off the loan as of December 15; Cameron promptly advised him of the amount which would then be due. Manning's plans did not "work out" and in December, 1965, he was, according to Camer-

on's records, delinquent in *six* instalment payments; it started foreclosure and this proceeded to the day of sale, at which time it accepted a payment of $1,950 (precisely six payments) and called off the sale upon the understanding with Manning that he would refinance the loan elsewhere and relieve Cameron of it altogether. This was the testimony of Mr. Pickett, Cameron's Executive Secretary. Manning apparently made efforts to refinance but never succeeded. Thereafter, according to the records, the July, August and September payments, 1966, became delinquent. The March payment had been delinquent but was paid on April 15; Cameron again insisted upon a full refinancing. On September 1, 1966, Cameron wrote Manning by certified mail as follows:

"Your repeated failure to live up to the terms of your Note and Deed of Trust with the Association has left us no alternative but to call the full amount of your Note due and payable. The present balance with interest charged to September 1st. is now $25,933.16.

"Please be advised that this loan must be paid in full no later than Tuesday, September 6th. or it will be necessary for us to turn your Deed of Trust over to the trustee for the proper action without further notice to you."

This letter was received on September 2, 1966. Again, on September 7, Cameron wrote that it would be willing to accept payment of the note in full plus actual costs at any time prior to October 7, the date fixed for foreclosure. Nothing further was ever paid or tendered to Cameron by Mr. Manning or his wife and in fact Manning did not talk to Mr. Pickett (or any other representative) until the day of sale, in his (Manning's) attorney's office. At that time Pickett again offered to accept the full amount due and call off the sale, and also offered to furnish the figures necessary for redemption; he again told Manning that his Association was not interested in carrying the loan any longer.

Before we leave the subject of payments one more item should be noted. There

were two windstorm or hail insurance losses on the property and Manning received certain insurance payments. He sent to Cameron insurance drafts of $347.50 and $70 on May 27, 1963, and a draft of $355 at some time prior to January 8, 1964. Payments of $367.21 and $355 were credited to the principal of the note rather than to instalment payments. Mr. Manning advised Cameron in writing on May 27, 1963, to apply to principal $367.24 from the total of the first insurance payments and another payment already made, "which was to be applied to the principal as per memorandum of May 6," retaining $355 for roof repairs. His book was endorsed accordingly (except for the correction of a three cent error). The $355 payment of January, 1964, was credited to principal after holding it in a "borrower's account" waiting for repairs to be made; this amount was credited to principal because the repairs had not yet been made, and it was apparently done also because it was an insurance payment covering a loss on the property. Any remaining balance from the insurance payments was paid to Manning for labor and materials used in making repairs. Manning now contends that these sums should have been credited to the regular instalments. We discuss that later. We find nothing in the record to substantiate the rather complicated argument that Cameron first applied these payments to instalments and later changed the application.

After receipt of the foreclosure notice on September 2, 1966, Manning did not communicate with Cameron. He made some effort to secure a new loan but was unsuccessful. He testified that he talked with plaintiff Long about two weeks before the sale and asked him "if he would make an inquiry for me" at Cameron, "and see if he could help me out of my situation for thirty or sixty days * * *." Long at first indicated that he could not, but finally said, "he would do it * * *." Later Manning saw Long shortly before the sale and asked him what he found out; Long answered: "Well, not very much," and Long further said, "If you don't bid on this, I am going to"; Manning's reply was:

"Well, we are going to bid on it." Manning also testified to a rather desultory conversation with Long after the sale, which possibly indicated (on Manning's version) that Long might be willing to let him have the property back if he raised the money promptly. If true, this is immaterial, for Manning never made any demand on Long for a conveyance and he never made any tender whatever to him. From the testimony of Mr. Pickett and Long, it was developed that Long (who was familiar with the property) talked to Mr. Johnson, an officer of Cameron, after the foreclosure was started and indicated that if the price was not too high he might be interested in buying the property. Manning, Long said, had asked him to "pretend" that he was interested in the property in order to create the impression that it was good security. Long later saw Manning and told him that if he did not get his problems solved, he was "going to bid on it for myself." Prior to the sale Long had talked with both Mr. Pickett and Mr. Johnson, officers of Cameron, told both that he was interested in the property, and made a tentative arrangement with Cameron to make him a loan if he bought the property; the evidence does not show any other agreement of any kind. At that time he asked, but was not told, the balance due on the note. Just prior to the sale Manning and his attorney, Mr. Ross, met Mr. Pickett in Ross's office. Mr. Pickett stated the amount due, and *admittedly* Manning did not offer to pay it, although he testified that he had a "check" in his pocket, signed by his father and brother in Iowa, for $26,362.82, payable to Cameron. Pickett stated then that they were still willing to accept the full amount and call off the sale. Mr. Ross then gave Pickett a notice of intention to redeem, which is not in evidence. The sale proceeded, as scheduled. Mr. Long and Mr. Ross were present. The trustee called the sale and asked for bids; Mr. Pickett bid $26,361.82, the full amount of the loan, plus costs. Mr. Long, on the next call, said that he bid "one dollar" more. There were no other bids, and the property was struck off to Long. The

evidence indicates that Manning was in a position to hear all of this and also to hear the conversation immediately following when Pulley asked Long's name and to whom he wished to have the deed made; Long then gave his name, and stated that the deed should be made to him. No suggestion or protest was made by Manning at any time, or by his attorney. The deed was prepared and executed on that day and given to Cameron (that day or the next) with instructions that it should not be delivered until full payment was made. Pulley received two checks of Cameron for the full amount of Long's purchase, apparently on October 13, 1966. He sent his check for one dollar to Manning and delivered the balance in payment of the note and costs. Long had, in the meantime, completed his loan transaction with Cameron in which he got a total loan of something more than his bid, but he also put up other property as additional security.

■ According to Cameron's computation the instalments of July, August and September, 1966, were delinquent at the time of the notice of foreclosure. Manning argues that he had all of September 1st in which to make that payment and that the demand was prematurely made. We consider that to be of no real importance, for he was already in default on two prior payments (as we hereafter indicate) and he did not receive the notice in any event until September 2nd. The note contained what we construe to be an acceleration clause, as follows: "If default be made in the payment of any of said monthly installments when due, the holder of this note may at its option declare all unpaid indebtedness evidenced by this note immediately due and payable, and thereupon the undersigned agree to pay all costs of collection, including attorney's fee allowed by law, if any." In such event the holder may declare all to be due upon default in any payment. Dalton v. Eaves, 92 Mo.App. 72. The evidence of Mr. Pickett was that the debtor was also delinquent in taxes and insurance.

■ Plaintiff added in his amended petition an alternative Count III for reimbursement in the event the court found that his title was invalid; this was later dismissed. The Court tried first, with a jury waived, all of the issues except the reasonable rental value of the premises. Primarily, the issue was the validity of plaintiff's title acquired at the sale. This, however, involved further findings: that the note was in default, that the sale was validly conducted, with consideration paid, that Long did not act as agent for Manning or for Cameron, and that there was no "conspiracy" between Long and Cameron. The Court by its interlocutory judgment as of May 22, 1968, found that plaintiff was the owner of the property in fee simple and that defendants Manning had no interest therein; it further found the issues against defendants Manning on Counts I and III of their counterclaim which asked that the sale be set aside, damages awarded, and for the rentals collected by plaintiff. In Count I defendants specifically raised the issue that Long was acting merely as agent with the knowledge of Cameron, but that he thereafter refused to reconvey to defendants. The Court also found the issues on defendants' third-party petition against them and for the third-party defendants. Therein defendants alleged: a wrongful declaration of default, that Long was defendants' agent but conspired with Cameron to defraud them and to defeat their right of redemption, that the trustee did not attempt to get the fair market value at the sale, that he did not receive any consideration, and that the sale was void. The Court entered orders and a judgment appropriate to its findings. Prior to the entry of that judgment the Court stated orally, after hearing all the evidence: that there was no believable evidence of any agreement that Long was to "act as an agent to buy the real estate * * *"; that there was no evidence that defendants attempted to have Long reconvey; that defendants had proven no fraud on Long's part, and that there was no evidence of any conspiracy between Long and the third-party defend-

ants; that plaintiff had failed to show that the trustee had not received the fair market value of the property; that the trustee received valid and legal consideration, and (on June 11, 1968, after briefs were filed) the Court found specifically that on the day foreclosure proceedings were commenced, "defendants were three (3) payments in default on their note and deed of trust." The record shows a compromise and dismissal of Count II of defendants' counterclaim, which involved personal property. On September 24, 1968, the Court took up the remaining issues, with a jury waived and upon a stipulation that defendants had remained in possession of one apartment with a reasonable rental value of $65 per month, and that a notice to vacate had been served. The Court then found that plaintiff was the owner and entitled to possession, and adjudged that plaintiff should recover the appropriate rentals. The two foregoing judgments disposed of all the issues raised in the complicated pleadings. The determination of a valid title in plaintiff Long was the one ultimate and decisive finding and conclusion. After the second judgment defendants filed a motion for new trial which, although not as detailed as it well might be, we shall consider as sufficient to raise the points briefed. No motion was filed after the first judgment, and this seems to be permissible under Rule 82.06, V.A.M.R.

█ Respondents first ask that the appeal be dismissed because appellants' points do not sufficiently state wherein and why the Court erred. The brief (not written by present counsel) is certainly no model. The Court essentially made general findings against the appellants on all issues, and since we are able to glean the contentions from the points and the argument we overrule the motion.

Appellants' contentions here (all of which go essentially to the contention that there could be no judgment in favor of plaintiff) are: (1) that the note was not in default when demand was made and that the use of foreclosure was "harsh"; (2)

that the trustee's sale was invalid for failure of consideration; (3) that as a matter of law "and the evidence" Long was acting as defendants' agent *or* was acting as an agent for Cameron in order to "quiet" the right of redemption. Thus we take up 1, default; 2, consideration; and 3, agency.

█ In this court-tried case we reverse only if the judgment is "clearly erroneous," and we should defer to the findings of the trial court where questions of credibility are involved; the general findings of the court were adverse to defendants on all of the points briefed. The trial court specifically found that three instalments were in default when the foreclosure was started. Respondents say that defendants admitted that they were in default; the defendants deny this. We look at the transcript. Mr. Manning testified that "legally" from what his counselor told him, it was "probably true" that he was short three payments on September 1, 1966, including the one due that day. He further admitted that forty-seven payments "cleared the bank." It is not denied that a total of 50 were due. We assume that Manning in his statement just quoted did not include the two insurance payments, which we shall discuss briefly. Those two payments were made in May, 1963, and January, 1964. Manning admitted in his testimony that he authorized Cameron to apply the first insurance payment on principal. The second one of $355 could not possibly have covered the three delinquencies existing at the beginning of foreclosure, for it would have left an excess of only $20 over *one* instalment payment, even if reapplied. Once a payment on a note has been properly applied to principal, the debtor may not later claim that it should be reapplied to cover a delinquent instalment. Edwards v. Smith, Mo., 322 S.W.2d 770. There is another reason why defendants may not now insist that the insurance payments be reapplied; their application to principal was shown on Manning's book; he maintained that he did not really understand the book, but he was legally bound

either to do so or to have it properly explained. Nearly two years after the last of these payments was applied to principal Cameron actually started a foreclosure but permitted defendant to pay $1,950 (exactly six payments) on the day set for the sale in order to stop the foreclosure. This was precisely the amount due on the delinquent instalments, with the insurance payments applied to *principal*. Defendant thus recognized the status of the delinquencies as of that time and the propriety of the application of the insurance money. See, again, Edwards, supra. Mr. Pickett testified that only 47 instalment payments were made, out of 50 which accrued. The credibility of a witness who construes a complicated account is primarily for the trial court and the court obviously believed Mr. Pickett. There is really no denial that from December, 1965, to the beginning of the present foreclosure, the July, August and September, 1966, instalments became delinquent. Mr. Manning testified that in August, 1966, Mr. Pickett told him that on September 1, 1966, he would have to pick up two back payments, "to which I agreed." We find it rather difficult to follow counsel's rather complicated arguments seeking to show that Cameron's demands in October, 1965, and thereafter indicated that it considered the insurance payments as credited to regular instalments. The facts are that Mr. Pickett testified that six regular instalments were due in December, 1965, that the insurance payments *had* been previously credited to principal, that Mr. Manning *acceded* and paid the six delinquent instalment payments, and that the trial court believed Mr. Pickett. The actual insurance credits, as entered on the records on May 28, 1963, and January 8, 1964, show that both amounts were then deducted in full from the principal balance of the note. Those entries were never altered. There is no evidence of any change, either of intention or of the records. We find that there was a default at the time defendants received the notice of foreclosure and also at the time it was sent, and that the acceleration provision justified

Cameron in declaring the entire balance to be due.

■ We consider next the contention that the sale was void, primarily for a supposed lack of consideration. This is apparently based on the fact that Mr. Pulley, the trustee, did not receive the amount of the bid on the day of sale, whereas the deed of trust required a sale for cash. Defendants' brief seems to concede that Mr. Pulley received the consideration on October 13, six days after the sale; and the uncontradicted evidence shows that he did so, in two checks of $2,500 and $23,862.82. These checks were those of Cameron from which Mr. Long had, in the meantime, procured his loan by executing the necessary papers. The money paid to the trustee was thus, in fact, the money of Mr. Long. We are cited to no authority holding that the purchase price must be paid on the date of sale. On the contrary, in Charles Green Real Estate Co. v. St. Louis Mutual House Bldg. Co., 196 Mo. 358, 93 S.W. 1111, it was held that payment made fifteen days after the sale (a deposit having been made at that time) was a substantial compliance with the requirement of a sale for cash. We find nothing to the contrary. We do find, however, the case of Snyder v. Chicago, S. F. & C. R. Co., 131 Mo. 568, 33 S.W. 67, in which payment to the trustee was apparently not made by the purchaser for approximately two months after the sale, after financing had been arranged and the sale (on behalf of a school fund) had been approved by the county court. The plaintiff there contended that the sale was not made for cash, but upon a secret arrangement for credit. The Court held that there was no abuse of authority by the sheriff as trustee, that plaintiff's mortgage had been satisfied, and that everything was fairly conducted. The contention that the sale was not made for cash within the meaning of the mortgage was denied. See also Webb et ux. v. Salisbury, 327 Mo. 1123, 39 S.W.2d 1045. It is a little surprising that we have not found more recent authority, but on that which exists, we hold that

Mr. Pulley did not abuse his authority, that he received and disbursed the full amount of the bid, and that the sale was made for cash. It was certainly not made upon credit, as that term is normally used. Defendants cite the cases of Bitzenburg v. Bitzenburg, 360 Mo. 70, 226 S.W.2d 1017, and Roberts v. Murray, Mo., 232 S.W. 2d 540. Neither is applicable here. In each it was essentially held that the note upon which a foreclosure is based must be a valid indebtedness, supported by consideration. There is no denial of that fact here. Defendants have not briefed the supposed inadequacy of price which they alleged in their pleadings.

■ The last contention is that Long was the agent of defendants in purchasing the property, *or* that he was the agent of Cameron in so doing, in order to cut out the equity of redemption (which would exist, of course, if the lender itself bought the property, and if the debtor later complied with our statutory requirements). It is significant that defendants are thus unable to make up their minds as to *whose* agent Long supposedly was. The initial conversation of Manning with Long was most vague; he testified that he only asked the latter to express an interest in the property and help him out. The whole contention is completely refuted, however, by the conversation held shortly before the day of the sale in which Long told Manning (as he admits) that he, Long, intended to bid on the property if Manning did not, and that Manning replied that "they were going to bid on it." Manning did not bid, but Long did, as he stated he would. Such declarations clearly refuted the idea of any agency of Long for Manning, and the latter admits that he had begun to "doubt" Long. Any idea on Manning's part of an agency was based upon pure assumptions with no expressed agreement, and even these assumptions were refuted by the conversation related above. Moreover, Manning never demanded that Long convey the property to him after the sale, and he certainly never tendered to Long the purchase price. He did nothing to carry out his part of any agency, even if there had been one (which there was not). We have considered and decided the agency question although there is some doubt in our minds as to whether the question could properly be raised in this litigation. Ordinarily, one claiming to be the principal would seek title by way of enforcing a trust, for legal title here is clearly in Long.

We have considered the cases cited by defendants on this point and find that they are not sufficiently applicable to justify a detailed discussion. They are: Fitzpatrick v. Federer, Mo., 315 S.W.2d 826; Leone v. Bear, 362 Mo. 464, 241 S.W.2d 1008; Stoffel v. Schroeder, 62 Mo. 147. Fitzpatrick was decided on the sufficiency of the petition only; it charged a specific agreement to "chill" a sale and prevent free competition. Leone apparently did not involve any question of agency, nor did Stoffel. The latter two cases do refer to foreclosures as "harsh." That is often true, but it cannot be denied that a creditor has the legal right to foreclosure if the proceedings are fairly and openly conducted.

There is no evidence whatever to support the alternative (and somewhat inconsistent) claim that Long acted as agent for Cameron. This claim is based, substantially, on the assertion that those two conspired to defeat defendants' equity of redemption. We agree with the trial court that there was "no evidence of any such conspiracy * * *." The dealings between Long and Cameron were normal business dealings in which Long tentatively arranged for a loan, the proceeds to be used by him if the property sold at a price which he would pay, and if he bid in the property, completed the loan and made payment. In these dealings Cameron told Long that it did not want the property and that if it was sold to it, that it, in turn, would sell it. There was no conspiracy and no agency. We do not find that the judgment was "clearly erroneous" in any

respect. On the contrary, we approve it upon our independent review.

The judgment is affirmed.

PER CURIAM.

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.