**BOATMEN'S BANK OF JEFFERSON COUNTY, Plaintiff and Counterclaim Defendant,**

v.

**COMMUNITY INTERIORS, INC., Ronald Eisenbeis, Karen Eisenbeis and Paul Harter, Defendants and Counterclaim Plaintiffs,**

v.

**BOATMEN'S BANK OF JEFFERSON COUNTY, Krazo, Inc., Forest T. Crump, Douglas Draper, Mason Investments, Inc., and Douglas Land Ltd., Counterclaim Defendants.**

No. 50499.

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 21, 1986.

Motion for Rehearing and/or Transfer Denied Nov. 25, 1986.

Application to Transfer Denied Jan. 13, 1987.

---

A.W. Dieffenbach, Jr., Hillsboro, Robert B. Hoemeke, Richard A. Wunderlich and Mary B. Nadworny, St. Louis, for Boatmen's Bank of Jefferson Co.

Benson Cytron, House Springs, for respondents Krazo, Inc., Forrest T. Crump, Douglas Draper, Mason Inv., Inc., and Douglas Land Ltd.

G. William Weier, Hillsboro, for defendant, Paul Harter, Attorney for Eisenbeises and Community Interiors, Inc.

Dana Hockensmith, Hillsboro, for defendants, Ronald Eisenbeis, Karen Eisenbeis, Mary Ann Eisenbeis and Community Interiors, Inc.

Gary Wagner, Farmington, for Ozark Federal Sav. & Loan Assn.

REINHARD, Judge.

Boatmen's Bank of Jefferson County sought a deficiency judgment against corporate mortgagor, its officers and statutory trustees, and guarantors of the mortgagor's note after a foreclosure sale of real estate. In a counterclaim and third-party petition, defendants sought to set aside the foreclosure sale and to recover damages. Following a trial without jury, the court entered judgment in favor of Boatmen's on the deficiency claim and against the original defendants on their claims. The court subsequently amended its judgment and found in favor of defendant Paul Harter on Boatmen's claim that he was liable as a guarantor of the note. Original defendants appeal the denial of their claims; Boatmen's appeals the judgment with respect to Harter's liability as guarantor. The appeals are consolidated here. We reverse the trial court's judgment with respect to Harter's liability as a guarantor; we affirm in all other respects.

In 1972, Community Interiors, Inc., borrowed money from Ozark Federal Savings and Loan Association and executed a deed of trust in favor of Ozark on its business premises in Festus, Missouri. At that time, Ron Eisenbeis was an employee and a minority shareholder of Community. In 1979 Eisenbeis and his wife, Karen, purchased all the stock in Community.

On February 27, 1980, Community executed a $52,000 note in favor of Boatmen's Bank of Jefferson County and secured it by a second deed of trust on its business premises. Prior to making the loan, Boatmen's obtained personal guaranties from Ron and Karen Eisenbeis and Paul Harter. Harter is a personal friend of Ron Eisenbeis and a successful businessman who has been in the plumbing supply business since 1940 and, at the time of trial, had been a member of the board of directors of Commerce Bank of Festus for approximately 17 years.

In August 1981, Ozark initiated foreclosure on its first deed of trust because of non-payment by Community on its note. Boatmen's officials informed Harter that Boatmen's intended to bid $93,000 at the foreclosure sale and that a deficiency probably would result.

On the morning of the foreclosure sale, September 15, 1981, Forrest Crump, a real estate broker and member of Boatmen's board of directors, went to Community's place of business, inspected the property, and told Ron Eisenbeis he was interested in bidding at the sale. According to Eisenbeis's testimony, Crump asked how much was owed on the property, and, when Eisenbeis said about $142,000, Crump said there "should be no problem bidding that much to cover that amount with some left over." Eisenbeis said he then told Crump that he would not bid on the property. At trial, Crump denied he made the statement.

Soon after Crump left, Harter arrived and offered to make financial arrangements to enable Eisenbeis to bid at the sale. Eisenbeis declined the offer, telling Harter that he was relying on Crump to bid enough to cover the total amount owed Ozark and Boatmen's. Harter testified he told Eisenbeis he did not believe Crump would bid more than what was required to purchase the property.

After inspecting Community's business premises, Crump telephoned Douglas Draper, successor trustee under the Ozark deed of trust to request, in Crump's words, a "short-term" loan from Draper's Mason Investments, Inc., to enable Crump's Krazo, Inc. to buy the property at the sale. Also that morning, a Boatmen's employee called Draper at Hillsboro Title Company, a firm wholly-owned by Draper, and requested that someone from the title company bid $93,000 on behalf of Boatmen's at the sale.

At the courthouse sale, Ron Eisenbeis, accompanied by a lawyer, served Draper with a notice of redemption. Draper announced that under the terms of the deed of trust and notice of foreclosure sale, the successful bidder would have to pay ten percent of the purchase price at the time of the sale and the balance in cash at the Hillsboro Title Company office within one hour of sale. Three bids were received: $76,000 from a representative of Ozark; $93,000 on behalf of Boatmen's (although there was no testimony about who actually made the bid, Draper was the only person

at the sale from Hillsboro Title, the company designated to bid for Boatmen's); and $93,050 from Crump on behalf of his company Krazo.

Crump did not make the ten percent down payment at the courthouse but did accompany Draper to the Hillsboro Title office where he executed a note on behalf of Krazo to Mason Investments. A check from Mason in the amount of the purchase price was deposited into the Hillsboro Title escrow account and funds then were disbursed to pay the $634 expenses of the sale (including Draper's trustee's fee), the $75,949.33 due Ozark, and $16,466.67 of the amount due Boatmen's. Three or four days after the sale, Crump proposed that Draper take a one-half interest in the property in exchange for cancellation of Krazo's note to Mason. Draper agreed, and on September 23, 1981, Crump and Draper, through Krazo, Inc., and Draper's Douglas Land Ltd., borrowed money from United Missouri Bank of Jefferson County to pay off Krazo's note to Mason. Crump and Draper personally guaranteed the loan. The loan was renewed several times, and Draper eventually purchased the note from United Missouri Bank. As of the day of trial, Draper was holder of the note. Title to the property has been in Krazo's name since the date of the foreclosure, and Crump and Draper have shared equally in the income and expenses of the property.

On October 2, 1981, Boatmen's demanded payment of $39,929.84, the amount of the deficiency, from Community, the Eisenbeises, and Harter. In May 1984, Boatmen's filed its suit to recover the deficiency plus interest and attorneys' fees. Defendants in Boatmen's suit filed a five-count counterclaim against Boatmen's and brought in as third-party defendants Ozark, Draper, Crump, Krazo, Mason Investments, Douglas Land, and United Missouri Bank. They sought compensatory and punitive damages and a court order permitting redemption of the property or requiring another trustee's sale. The court, after modification, entered its final judgment against the statutory trustees and Ron and Karen Ei-

senbeis as guarantors in the amount of $72,085.64 plus $13,175.78 in attorneys' fees.

On appeal we must sustain the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

We deal first with the appeal of Community, the Eisenbeises, and Harter. They contend the foreclosure sale is voidable, alleging that Draper breached his fiduciary duty as trustee and that Draper and Crump chilled the sale. The trial court found no misconduct on the part of either.

These original defendants allege several actions by Draper constitute a breach of his fiduciary duty as trustee, namely, that he acquired an interest in the property after the sale; he acquired an interest in the outcome of the sale by financing Krazo's purchase; he bid on behalf of Boatmen's, holder of the second deed of trust; he did not sell the property for cash; he sold the property for "grossly inadequate consideration"; and he acted in concert with Crump in chilling the sale because Crump's representation to Eisenbeis induced the original defendants not to bid.

 Initially we note that a trustee, exercising a power of sale under a deed of trust, is the agent of both mortgagee and mortgagor and should act with impartiality and integrity. *Judah v. Pitts*, 333 Mo. 301, 62 S.W.2d 715, 720 (1933). The law requires the trustee to exercise sound discretion and to conduct the sale in a manner which renders the "sale most beneficial to the debtor at the best possible price." *Roark v. Plaza Savings Association*, 570 S.W.2d 825, 829 (Mo.App.1978). When fraud or unfair dealing surrounds a foreclosure sale, the remedy is to set aside the sale. *Smith v. Haley*, 314 S.W.2d 909, 915 (Mo.1958).

Original defendants' most serious complaints involve their contentions about the trustee's acquiring an interest in the property. The law is clear that the trustee in a deed of trust may not, without the consent of the maker of the note secured by the deed of trust, directly or indirectly purchase the property at a foreclosure sale. *Euge v. Blase*, 339 S.W.2d 807, 811 (Mo. 1960). The original defendants contend that the sale must be set aside because Draper acquired an interest in the property after the sale. Crump and Draper testified about their previous business dealings with each other. Krazo often had borrowed money from Mason to finance real estate acquisitions, and, over about a 10–year period, Crump and Draper, acting through their respective corporations, had acquired as partners about 25 parcels of real estate taking title in the name of Krazo and often personally guarantying acquisition financing. Profits and losses from the real estate thus purchased were divided equally.

The original defendants argue that, because of Crump and Draper's prior dealings, it can be inferred that Draper, at least indirectly, sold the property to himself. However, the trial court found that there was no agreement between Crump and Draper prior to the sale as to who would become owner of the real estate and that Draper did not, prior to the sale, agree or intend to take an interest in the real estate. Rather, the court found that Draper agreed to take an equity interest in the real estate four days after the sale.

As contended by the original defendants, when a trustee repurchases trust property after his foreclosure sale, equity will look upon the repurchase "with a suspicious eye and will jealously scrutinize the transaction." *Smith v. Haley*, 314 S.W.2d at 914 (Mo.1958). In this case, the trial court, in its findings and conclusions, recognized its duty to "scrutinize the transaction to ascertain whether [Draper] used the powers given him as Trustee to facilitate the acquisition of an interest in the property."

Original defendants rely primarily on *Haley*, 314 S.W.2d 909, and *Miles v. Popp*, 192 S.W. 424 (Mo.1917), to support their argument that the sale should be set aside because Draper acquired an interest in the property four days after the sale. In *Ha-*

*ley*, the court held that repurchase of the property by the trustee 30 minutes after the foreclosure sale "exacts greater fidelity on [the trustee's] part as a fiduciary ..." 314 S.W.2d at 914. The court found a lack of fairness in the discharge of the trustee's duties because the notice of the foreclosure sale was defective in its statement of the time of sale and the land description, the mortgagors had no actual knowledge or notice of the sale, no demand for payment had been made on mortgagors, and the trustee knew of the father-daughter relationship between the mortgagee and one mortgagor and, had he inquired, would have discovered the mortgagee's promise to his daughter to purchase the property and bear the loss which resulted to the property from a fire which he caused.

■ *Miles* likewise can be distinguished from the instant case. The court in *Miles* specifically found that the trustee was a secret purchaser, *at the sale*, of a half interest in the land. 192 S.W. at 426. In the instant case, the trial court, after recognizing its responsibility to scrutinize the transaction, specifically found that trustee Draper did not agree to take an equity interest in the property until four days after the sale. The court's determination is supported by the evidence.

■ The original defendants also contend that "the trustee acquired an interest in the outcome of the sale by financing the purchaser," and that such action is a breach of his fiduciary duty which makes the sale voidable. They cite no authority for this proposition. The evidence reveals that Crump requested a short-term loan and that he executed a note on behalf of his corporation in favor of Mason. Draper, by making the loan, did not acquire an interest in the real estate.

■ Although we find very little law on the subject, we find no wrong-doing on the part of the trustee in announcing the bid of the second mortgagee Boatmen's at the sale. It has been held in this state and elsewhere that a trustee may announce a bid for a bidder even though the bidder is not present at the sale. *See, Springfield Engine and Thresher Co. v. Donovan*, 147 Mo. 622, 49 S.W. 500 (1899) (Trustee accepted a bid contained in a letter from the beneficiary of a deed of trust.); *Allied Mortgage and Development Co. v. Pitts*, 272 N.C. 196, 158 S.E.2d 53 (1967) (Holder of note filed bid with trustee prior to sale, and trustee announced the bid which was the only one made.).

■ Allegations that Draper did not sell the property for cash are also without merit. A cash foreclosure sale contemplates payment by cash, cashier's check, or certified funds. *Roark*, 570 S.W.2d at 827. One purpose of requiring payment in such a manner is to insure that a winning bidder is able to pay the purchase price so that a debtor cannot indefinitely frustrate a foreclosure sale. *Id.* at 829. The evidence was that within an hour of the sale, a Mason Investments check was deposited into the Hillsboro Title Company escrow account, and the money then was disbursed to the mortgagees and to pay the costs of sale. In *Long v. Manning*, 455 S.W.2d 496 (Mo. 1970), the supreme court held that a trustee's sale for cash would not be set aside even though the high bidder did not pay the trustee until six days after the sale. *Id.* at 502. In *Long*, although the purchaser paid by check, the court said "the sale was made for cash." *Id.* at 503. Therefore, to contend that a cash sale requires payment in "greenbacks" is incorrect.

The original defendants also allege that the trustee sold the property for "grossly inadequate consideration." The property was sold for $93,050.00. Original defendants presented testimony of a real estate appraiser that the property was worth between $310,000.00 and $400,000.00 in 1979. Ron Eisenbeis testified he valued the property at $300,000.00 at the time of sale. There was testimony that the real estate market began to deteriorate in the spring of 1980, and that, at the time of sale, interest rates were at 20 percent or more.

■ To set aside a foreclosure sale, evidence of an inadequate sale price generally must be accompanied by substantial

evidence that, for example, the sale was held at an unusual hour, the trustee abused his discretion in exercising his power of sale, or there was unfairness or partiality in the conduct of the sale, and that the complaining party suffered harm as a result. *West v. Axtell*, 322 Mo. 401, 17 S.W.2d 328, 335 (1929). If a sale is "fairly and lawfully conducted, without fraud and partiality and with full opportunity for competitive bidding," an inadequate sale price alone will not justify setting aside a foreclosure sale. *Mueller v. Simmons*, 634 S.W.2d 533, 536 (Mo.App.1982). There has been no allegation that the sale was not advertised as required by statute or that it was held at an unusual hour or location. Original defendants' allegations of irregularities in the conduct of the sale have been held against them. Therefore, had the sale price been inadequate, it would not justify setting aside the sale. Furthermore, we cannot say that the sale price here was so grossly inadequate as to compel us to set aside the sale on that ground alone. *See Mueller*, 634 S.W.2d at 536.

■ Original defendants also contend that Draper and Crump, acting in concert, chilled the sale by inducing Harter and the Eisenbeises not to bid. Their complaint is based on the testimony of Ron Eisenbeis that Crump said there "should be no problem bidding [$142,000] with some left over," and that this statement induced the original defendants not to bid at the sale. There was no evidence that connected Draper to this alleged statement. Harter, Eisenbeis's friend and benefactor, did not rely on the statement because he told Eisenbeis that he did not believe Crump would bid more than the amount necessary to purchase the property. The answer to this point was well-stated by the trial court in its findings and conclusions when it found that Eisenbeis did not rely on the statement, and was not entitled to rely on the statement. The court then stated that:

A reasonable person would not believe that anyone would bid more than was necessary to be the highest and last bidder at a foreclosure sale, and a reasonable person would not rely on a representation that a person would bid more than was necessary to be the highest and last bidder at a foreclosure sale.

We have examined the original defendants' other complaints and find no error by the trial court.

We turn now to the appeal of Boatmen's Bank regarding the liability of Harter as guarantor of the Community Interiors, Inc. note. When Ron Eisenbeis first approached Boatmen's for the $52,000 loan, the bank refused. Eisenbeis then prevailed upon Harter to guarantee a loan for him. Harter testified it was his understanding his guaranty was for three or four months only, until Eisenbeis could secure a Small Business Administration loan. Boatmen's Bank president John Lanham testified no representation was made to Harter about an SBA loan or about the alleged short-term nature of Harter's guaranty.

Harter executed a guaranty in favor of Boatmen's on February 25, 1980, and two days later Boatmen's made the $52,000 loan to Community which was secured by the second deed of trust on the business premises. The guaranty signed by Harter, which made no reference to any specific note, contained this language:

In consideration of Boatmen's Bank of Jefferson County (hereinafter "Bank"), making advances of money or otherwise giving credit to Community Interiors, Inc. (hereinafter "Borrower"), the undersigned does hereby *guarantee* the full and prompt payment to said Bank of *all indebtedness, obligations and liabilities* of said Borrower to said Bank *now existing or hereafter created or arising*.

This is a *continuing, absolute and unconditional guarantee and shall continue in force with respect to all indebtedness of the Borrower until terminated as to the undersigned upon receipt of written notice by the Bank from such undersigned to that effect* ... in which [event] it will not apply as to any advances made thereafter, but will remain in full force as to the indebtedness then existing.

This *guarantee is absolute and is not affected by any failure of the Bank to give notice of default* on the part of the Borrower, *nor by extensions* granted to said Borrower, nor by any acts or omissions whatsoever by the Bank relative to the indebtedness of the Borrower or any of the undersigned or any collateral that may be secured therefor....

....

It is understood that the *amount of credit* that may be extended to Borrower, and the amount of indebtedness or liability that may be incurred by Borrower *is not limited*. The *liability of the undersigned* to the Bank hereunder *shall be unlimited* unless otherwise indicated herein. (Emphasis added.)

On February 27, 1981, Community was in default on the note. Boatmen's and Community entered into a "renewal agreement" which extended the due date from February 27, 1981, to August 27, 1981, and increased the interest rate from 15 percent to 18½ percent. Harter was not notified of the renewal.

In its original judgment, the trial court found that Harter had signed a guaranty with terms as set out above and that Boatmen's had not authorized its employees to make representations in direct conflict with "the plain meaning" of Harter's guaranty. In its modified judgment, the trial court did not alter its findings of fact but it did find in favor of Harter on the issue of his liability because:

[a] material alteration in, or departure from the contract of guarantee or the terms of the underlying obligation without guarantor's consent will discharge him. While it is true that the guarantee in question extends to all indebtedness, obligations and liabilities now existing or hereafter created or arising, the Court concludes that to bind Mr. Harter as to future notes, advances, or any extension of existing obligations, such undertakings would have to be un-

der the same terms and conditions as appear in the initial contract and when *the underlying note, upon which the guarantee was initially made, and which formed a part of the agreement,* was materially changed by a substantial increase in the interest rate Mr. Harter was discharged as he did not consent. Mr. Harter could not be heard to complain if the makers executed an extension or new note or new notes increasing the principle (sic) indebtedness under the same terms and conditions.... (Emphasis added).[1]

Boatmen's contends that the trial court's amended judgment "transformed the plain and simple language of the continuing and absolute guaranty signed by Harter into a limited guaranty." A guarantor's liability is to be construed strictly according to the terms of the guaranty agreement. *U.S. Suzuki Motor Corp. v. Johnson,* 673 S.W.2d 105, 107 (Mo.App.1984). A guaranty is collateral to and independent of any underlying agreement, and a guarantor's liability is primarily dependent upon the guaranty agreement itself. *Standard Meat Co. v. Taco Kid,* 554 S.W.2d 592, 595 (Mo.App.1977). Any ambiguity in a guaranty agreement should arise from the guaranty itself. *Id.* We believe the guaranty agreement here is clear and unambiguous. The trial court found no ambiguity in the guaranty agreement signed by Harter and specifically found that Boatmen's officials had no authority to alter "the plain meaning of the 'Guarantee.'"

The guaranty agreement signed by Harter was a "continuing guaranty," a fact Harter essentially admits in his brief and oral argument. A continuing guaranty is simply a divisible offer for a series of separate unilateral contracts. *Mercantile Trust Co. v. Carp,* 648 S.W.2d 920, 923 (Mo.App.1983). A continuing guaranty contemplates a series of transactions between debtor and creditor, rather

---

1. The record reveals that the reasons given by the trial court for finding that Harter was not liable under the guaranty were not raised in the pleadings nor addressed by Harter in his testimony.

than a single debt. *Bruce v. Landmark Central Bank and Trust Co.*, 592 S.W.2d 198, 200 (Mo.App.1979). By his guaranty, Harter guaranteed *all credit* extended to Community Interiors, Inc., including the note executed February 27, 1980, the February 27, 1981, renewal, and any other credit granted Community by Boatmen's until the guaranty was terminated by Harter. Harter never terminated the guaranty.

Harter places great reliance on *Citizens Bank of Smithville v. Lair,* 687 S.W.2d 268 (Mo.App.1985). *Lair* involved a suit by a bank against a guarantor on a promissory note executed by the guarantor's son. The note provided for an interest rate of 14.6 percent and was secured by growing crops. Interest after maturity would be at the "maximum rate permitted by law." The note also provided that "[n]o renewal or extension of this note ... shall affect the liability of any parties liable hereon." The guarantor executed a guaranty agreement *on the back of the promissory note* by which the guarantor acknowledged himself to be "fully bound by all provisions of said Agreement, and expressly agree[d] to pay all amounts owing hereunder, upon demand, without requiring any action or proceeding against debtors."

One month after the note's due date, the bank and the maker entered into an agreement which extended the due date six months beyond original maturity and increased the interest rate by two-tenths of one percent to 14.8 percent. The guarantor was unaware of these changes.

The court found that the increase in interest rate and the extension of the period of repayment of the note from eight to fourteen months were material changes to which the guarantor did not consent. The court also construed the "extension agreement" to be a new note rather than a renewal or extension. The court concluded that the guarantor was released from liability on the original note.

*Lair* is readily distinguished from the instant case. The guarantor in *Lair* signed a guaranty agreement on the note itself.

Harter signed a separate document which stated that the guaranty applied to "all indebtedness, obligations and liabilities of [Community Interiors]." The guaranty signed by Harter made no reference to a specific note.

Other cases cited by Harter likewise are inapposite. *Golden Sun Feeds, Inc. v. Dugan,* 682 S.W.2d 173 (Mo.App.1984), like *Lair,* involved endorsement by the guarantor on the notes themselves. *First State Bank v. Benson,* 613 S.W.2d 888 (Mo.App. 1981) involved a continuing guaranty such as in this case; however, the bank in *Benson* renewed an obligation after revocation of the guaranty agreement by the guarantor, something Harter could have done, but did not do.

Harter also contends that Boatmen's "failed to act in good faith and with a reasonable degree of care in dealing with the collateral" because its bid was for inadequate consideration. Boatmen's was under no obligation to bid the fair market value of the real estate or the amount owed on the property. In fact, the bank was under no obligation to bid at all. *See Des-Lauries v. Shea,* 300 Mass. 30, 13 N.E.2d 932, 937 (1938). Moreover, Boatmen's officials warned Harter about the amount the bank intended to bid and the likelihood of a deficiency. This is evidence of a good faith attempt to protect Harter's interests as a guarantor. *See Lair,* 687 S.W.2d at 272.

The trial court's judgment with respect to Harter's liability as a guarantor is reversed and remanded to the trial court with instructions to enter judgment against Harter in the amount of the judgment rendered against the co-guarantors of the note. In all other respects the judgment is affirmed.

SMITH, P.J., and DOWD, J., concur.