

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| DENNY LABANTSCHNIG, | ) | No. ED112169 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | Cause No. 19SL-CC04557 |
| | ) | |
| ROYAL GATE, INC., ET AL. | ) | Honorable Kristine A. Kerr |
| | ) | |
| Appellants. | ) | FILED: November 19, 2024 |

<u>Opinion</u>

Dr. Cyrus Alizadeh (Alizadeh) appeals from the trial court's judgment finding him liable on a breach of guaranty (Personal Guaranty) in favor of Denny Labantschnig (Labantschnig) in connection with a loan obtained to help keep Royal Gate, Inc. (Royal Gate) in business. Alizadeh raises six points on appeal. Point One argues the trial court misapplied the law by overbroadly interpreting the term "Agreement" in the Personal Guaranty beyond Alizadeh's intention to guarantee only an irrevocable letter of credit (ILOC). Point Two contends no substantial evidence supported the trial court's finding that the Personal Guaranty guaranteed the debt Royal Gate incurred under a Credit, Procurement, Reimbursement, and Indemnity Agreement (CPRI Agreement). Point Three maintains the trial court misapplied the law because Alizadeh never agreed to extend Royal Gate's original repayment deadline under the CPRI Agreement. Alizadeh alleges the repayment extension amounted to a material alteration that

discharged him as guarantor. Points Four and Five, respectively, assert no substantial evidence supported the trial court's findings that the Personal Guaranty was tendered to Labantschnig or that it was supported by adequate consideration. Lastly, Point Six argues the trial court erred by awarding attorneys' fees to Labantschnig because the Personal Guaranty's fee provision applied only to the liabilities of Royal Gate and not of Alizadeh.

We find the Personal Guaranty unambiguously incorporated the underlying CPRI Agreement between Labantschnig and Royal Gate. Therefore, the trial court did not err in finding Alizadeh liable for the debt incurred by Royal Gate and owed to Labantschnig under the CPRI Agreement, and we deny Points One and Two. No material alteration was made to the Personal Guaranty when Royal Gate's repayment deadline was extended for several months at the same interest rate, because under the terms of the Personal Guaranty and CPRI Agreement, Alizadeh agreed to a continuing guaranty for all then-existing and future liability arising out of the CPRI Agreement. Alizadeh was thus not entitled to be discharged from his guaranty, and we deny Point Three. We deny Point Four because Alizadeh contracted to waive his right to notice of Labantschnig's acceptance of the Personal Guaranty. We deny Point Five because the Personal Guaranty served as prima facie evidence of consideration and did not require showing a benefit to Alizadeh. Finally, the trial court did not err in awarding attorneys' fees because the Personal Guaranty provided for them in that Labantschnig's breach-of-guaranty action was brought against Alizadeh to recover losses incurred in connection with Royal Gate's obligations under the CPRI Agreement. Accordingly, we affirm the trial court's judgment. Because Labantschnig is the prevailing party on appeal, we grant his motion for attorneys' fees pursuant to the guaranty, and we remand for the trial court to enter an award of reasonable attorneys' fees.

Background

Royal Gate owned and operated two automobile dealerships. Robert Kelly (Kelly) and Alizadeh were the shareholders and owners of Royal Gate through Royal Gate Holding Company. Kelly was the president and majority shareholder of Royal Gate and ran the day-to-day operations. Alizadeh was the minority shareholder of Royal Gate. Labantschnig was brought on as a manager in 2015. Royal Gate was experiencing financing issues on its vehicle inventory with its lender, NextGear. In 2018, Royal Gate requested that Labantschnig obtain a line of credit from a bank (Bank) in order to loan funds to Royal Gate to assist with the company's financing issues until it could sell its two dealerships. Labantschnig agreed to do so only if a guaranty was provided. Bank's chief lending officer (Bank Officer) discussed the loan details with Kelly, Alizadeh, and Labantschnig, and explained to them that a line of credit would be arranged. Following loan negotiations, Labantschnig and Royal Gate entered into the CPRI Agreement.

The CPRI Agreement provided that Labantschnig would obtain a $1.5 million line of credit with Bank for the benefit and use of Royal Gate for short-term credit needs, pending the sale of one of its two dealerships, and a standby ILOC against which NextGear could draw in the event that Royal Gate failed to meet its financial obligations. The CPRI Agreement indemnified Labantschnig against all losses, damages, interest, costs, and expenses. The CPRI Agreement set forth Royal Gate's repayment obligations for the principal balance and accrued interest, including monthly interest payments of $6,000. The repayment deadline was set on the date of the first dealership's closure or June 1, 2019, whichever occurred first. The CPRI Agreement was on the first three pages of a five-page document. The fourth page was the Personal Guaranty, and the fifth page was blank. Each of the five pages had the same footer identifying

the page number out of five as well as the same timestamp and version of the "LOC Agreement." Labantschnig and Kelly signed the CPRI Agreement in Kelly's office on March 23, 2019.

The same day, Alizadeh signed the Personal Guaranty in Kelly's office. The Personal Guaranty guarantees Royal Gate's liabilities under the CPRI Agreement. Under the Personal Guaranty, Kelly, Kelly's wife, and Alizadeh agreed to be jointly and severally liable to Labantschnig in their personal capacities and as for Kelly and Alizadeh liability also extended to them in their capacity as owners of Royal Gate. The Personal Guaranty states in relevant parts:

> For and in consideration of the premises, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce [Labantschnig] to perform its obligations hereunder, the undersigned, jointly and severally, do hereby personally guaranty to [Labantschnig] the payment of all liabilities and obligations of Royal Gate to [Labantschnig] and Bank of any nature arising under and pursuant to the Agreement, whether now existing or hereafter incurred, whether created directly or acquired by [Labantschnig] by assignment or otherwise, whether matured or unmatured and whether absolute or contingent. The undersigned shall reimburse [Labantschnig], to the extent that such reimbursement is not made by Royal Gate, for all ILOC draws, expenses (including counsel fees), and other losses incurred by [Labantschnig] in connection with any liabilities or obligations of Royal Gate under the Agreement.
> . . .
> This is a continuing guaranty and shall remain in full force and effect irrespective of any interruptions in the business of any of the parties. All monies available to [Labantschnig] for application in payment or reduction of the liabilities or obligations of Royal Gate may be applied by [Labantschnig] in such manner and in such amounts and at such time or times as it may see fit to the payment or reduction of such liabilities or obligations as [Labantschnig] may elect, and the obligations pursuant to this guaranty shall not be affected by any surrender or release by Royal Gate of any other security held by it for any claim hereby guaranteed. The undersigned hereby waive (a) notice of acceptance of this guaranty, (b) presentment and demand for payment of any of the liabilities or obligations of Royal Gate, (c) protest and notice of dishonor or default to the undersigned or to any other party with respect to any of the liabilities or obligations of Royal Gate, (d) all other notices to which the undersigned might otherwise be entitled, and (e) any demand for payment under this guaranty.

Two days later, on March 25, 2019, Labantschnig procured a $1.5 million line of credit from Bank. The funds were deposited into Royal Gate's operating account, and Royal Gate used

4

the funds to operate its business. Royal Gate made four monthly interest payments to Labantschnig.

Royal Gate completed the sale of the first dealership on September 6, 2019, triggering its full repayment obligations to Labantschnig under the CPRI Agreement. On September 25, 2019, Labantschnig, through counsel, made a demand for Royal Gate to complete its outstanding payments. Royal Gate did not repay Labantschnig at that time. Kelly and Alizadeh met with Labantschnig, and Kelly explained that Royal Gate would be able to pay him after closing the second dealership.

After the second dealership closed on October 3, 2019, Royal Gate repaid Labantschnig half of the principal balance on the line of credit. Royal Gate made no further payments towards either the principal or the interest. Labantschnig paid Bank the remaining $750,000 principal balance and $41,096.04 in accrued interest.

In March of 2020, Labantschnig filed a first amended petition, which included the subject claim for breach of guaranty against Alizadeh.[1] The case proceeded to a bench trial. The trial court issued judgment in favor of Labantschnig, finding he was entitled to recover on the Personal Guaranty against Alizadeh. Alizadeh filed this appeal. Labantschnig moved for appellate attorneys' fees, and we took the motion with the case.

<u>Standard of Review</u>

"[W]e will affirm the judgment of the trial court in a court-tried case unless the judgment is unsupported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law." *Lehman v. Auto. Invs., LLC*, 608 S.W.3d 733, 737 (Mo. App. E.D. 2020) (internal citations omitted); *see also Ivie v. Smith*, 439 S.W.3d 189, 198–99 (Mo. banc

---

[1] Labantschnig also brought a claim against the Kellys, and they entered into a consent judgment.

5

2014) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). "We view the evidence in the light most favorable to the judgment, accepting all evidence and inferences favorable to the judgment as true and disregarding all contrary evidence and inferences." *Lehman*, 608 S.W.3d at 737 (internal citation omitted). "We defer to the trial court's judgment on contested issues of fact, but we review issues of law de novo." *Id.* (internal quotation omitted); *see also Martin v. McEvers*, 104 S.W.3d 785, 787 (Mo. App. W.D. 2003). "[T]he interpretation of a contract is an issue of law, which we review de novo." *Ebert v. Ebert*, 627 S.W.3d 571, 579 (Mo. App. E.D. 2021) (internal quotation omitted).

"We are primarily concerned with the correctness of the result, not the route taken by the trial court to reach it." *Clark v. Smith*, 644 S.W.3d 835, 840 n.4 (Mo. App. W.D. 2022) (quoting *Mo. Soybean Ass'n v. Mo. Clean Water Comm'n*, 102 S.W.3d 10, 22 (Mo. banc 2003)); *Lehman*, 608 S.W.3d at 737 (internal quotation omitted). Therefore, we will affirm the trial court's judgment "if it is correct on any ground supported by the record, regardless of whether the trial court relied on that ground." *Clark*, 644 S.W.3d at 841 n.4 (citing *Mo. Soybean*, 102 S.W.3d at 22); *Lehman*, 608 S.W.3d at 737 (internal quotation omitted).

Discussion

## I.     Points One and Two—The Personal Guaranty Guaranteed the Debt Incurred under the CPRI Agreement

In Points One and Two, Alizadeh argues the trial court erred in finding he guaranteed the CPRI Agreement. Specifically, in Point One, Alizadeh maintains that the trial court misapplied the law because it should have strictly construed the ambiguous term "Agreement" in the Personal Guaranty to comport with his understanding that the Personal Guaranty was limited to Labantschnig procuring an ILOC in favor of Royal Gate's lender, NextGear, rather than a line of credit to meet Royal Gate's short-term credit needs. In Point Two, Alizadeh asserts no

6

substantial evidence supported the trial court's finding that Royal Gate's debt to Labantschnig under the CPRI Agreement was guaranteed by the Personal Guaranty.

To recover on guaranty, a plaintiff must show the following:

(1) that the defendant executed the guaranty, (2) that the defendant unconditionally delivered the guaranty to the creditor, (3) that the creditor, in reliance on the guaranty, thereafter extended credit to the debtor, and (4) that there is currently due and owing some sum of money from the debtor to the creditor that the guaranty purports to cover.

*Pulaski Bank v. Nantucket Partners, L.C.*, 428 S.W.3d 729, 734 (Mo. App. E.D. 2014) (quoting *ITT Com. Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993)). Alizadeh argues the Personal Guaranty does not purport to cover the debt incurred by Royal Gate owed to Labantschnig. We disagree.

Alizadeh correctly notes that a guarantor's liability is to be strictly construed according to the terms of the guaranty agreement. *Boatmen's Bank of Jefferson Cnty. v. Cmty. Interiors, Inc.*, 721 S.W.2d 72, 79 (Mo. App. E.D. 1986) (internal citation omitted). When interpreting the terms of a guaranty agreement, as with any contract, "[w]e read the contract as a whole to determine the intent of the parties and give the terms used their plain and ordinary meaning." *Schoedinger v. Beck*, 557 S.W.3d 531, 536 (Mo. App. E.D. 2018) (citing *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003)). When a guaranty agreement explicitly incorporates other documents, such as an underlying debt agreement, we construe them together. *See Big A LLC v. Vogel*, 561 S.W.3d 28, 35 (Mo. App. W.D. 2018) (internal citations omitted) (noting further that even in the absence of explicit textual incorporation, a guaranty agreement may be construed together with any contemporaneously executed agreements dealing with the same subject matter as an aid in ascertaining the intention of the parties). "Matters incorporated into contract by reference are as much a part of the contract as if they had been set

7

out in the contract *in haec verba* [verbatim]." *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 196 (Mo. App. E.D. 2006) (internal citation omitted).

Absent ambiguity in the guaranty itself, we will not consider extrinsic evidence to ascertain the intent of the parties. *Boatmen's*, 721 S.W.2d at 79 ("Any ambiguity in a guaranty agreement should arise from the guaranty itself."). "Where the parties have expressed their final and complete agreement in writing and there is no ambiguity in the contract, the intent of the parties must be determined solely from the four corners of the contract itself" and "extrinsic evidence cannot be used to create an ambiguity." *Schoedinger*, 557 S.W.3d at 536 (internal quotations omitted).

Here, we reject Alizadeh's claim that the term "Agreement" in the Personal Guaranty is ambiguous. *See Boatmen's*, 721 S.W.2d at 79–80 (internal citation omitted) (finding a guaranty was clear and unambiguous by its own terms); *see also Dunn*, 112 S.W.3d at 434 (internal citation omitted) (noting "strict construction does not entitle a guarantor to demand an unfair and strained interpretation of the words used in order that it may be released from the obligation that it has assumed"). The Personal Guaranty signed by Alizadeh explicitly and unambiguously incorporates the CPRI Agreement. The Personal Guaranty is labeled as page four out of the same five-page document containing the CPRI Agreement on pages one through three, and it bears the same timestamp and version of the "LOC Agreement." Moreover, the Personal Guaranty expressly binds Alizadeh to "personally guaranty to [Labantschnig] the payment of all liabilities and obligations of Royal Gate to [Labantschnig] and Bank of any nature arising under and pursuant to the Agreement[.]" The Personal Guaranty requires Alizadeh to "reimburse [Labantschnig], to the extent that such reimbursement is not made by Royal Gate, for all ILOC draws, expenses (including counsel fees), and other losses incurred by [Labantschnig] in

8

connection with any liabilities or obligations of Royal Gate under the Agreement." Given this clear language, the trial court did not err by interpreting the term "Agreement" to mean the CPRI Agreement.

Because the Personal Guaranty incorporates the CPRI Agreement, the trial court properly construed them together to find Alizadeh guaranteed all liability arising out of the CPRI Agreement. *See Boatmen's*, 721 S.W.2d at 79 (internal citation omitted); *see also Ulreich v. Kreutz*, 876 S.W.2d 726, 728 (Mo. App. E.D. 1994) (internal citations omitted) (finding a trial court did not impermissibly extend the guarantors' obligation by holding them liable on promissory notes where the guaranty unambiguously guaranteed the payment of all loans, credit, and indebtedness, such that the notes could be interpreted as loans covered by the guaranty).

Alizadeh attempts to argue that he should be discharged from his guaranty because he did not understand what he was signing. He believed, based on prior conversations between the parties, that the underlying debt agreement was going to be different than what was in the CPRI Agreement. Specifically, Alizadeh maintains he only intended to guarantee Labantschnig's procurement of an ILOC against which NextGear could draw. However, because the "Agreement" guaranteed by the Personal Guaranty is not ambiguous, we may not consider extrinsic facts outside the Personal Guaranty or the incorporated CPRI Agreement to ascertain the intent of the parties. *See Schoedinger*, 557 S.W.3d at 536; *Boatmen's*, 721 S.W.2d at 79 (internal citation omitted).

Furthermore, Alizadeh acknowledges that failure to read and understand a contract is not a defense to it. *See Lopez v. GMT Auto Sales, Inc.*, 656 S.W.3d 315, 321 (Mo. App. E.D. 2022) (quoting *Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 228 (Mo. banc 2013) ("[A] signer's failure to read or understand a contract is not, without fraud or the signer's lack of

capacity to contract, a defense to the contract.")). The trial court made the factual finding that Alizadeh had the opportunity to read the Agreement but failed to do so. "[A] guaranty is a contract, and, absent fraud, accident or mistake, a party is 'held to have had knowledge of a contract which he or she had an opportunity to read but did not by reason of indolence, folly or careless indifference to the ordinary and accessible means of information.'" *Mercantile Tr. Co. v. Carp*, 648 S.W.2d 920, 924 (Mo. App. E.D. 1983) (internal quotations omitted) (holding a party's failure to read and understand a continuing guaranty she signed did not permit her to escape liability on it). Alizadeh nevertheless suggests this legal proposition does not apply here because he was not a signatory to the CPRI Agreement. We disagree with his reasoning. As stated above, the terms of the Personal Guaranty and the incorporated CPRI Agreement must be construed together. *See Big A*, 561 S.W.3d at 35 (internal citation omitted); *Intertel*, 204 S.W.3d at 197 (internal citation omitted); *cf. Dunn*, 112 S.W.3d at 435 (noting that an arbitration agreement may be enforced against a guarantor who is not a signatory to the arbitration agreement where the guaranty agreement incorporates the arbitration agreement by reference). Therefore, Alizadeh's failure to read either of their terms is no defense to liability. *See Lopez*, 656 S.W.3d at 321 (citing *Chochorowski*, 404 S.W.3d at 228); *Mercantile*, 648 S.W.2d at 924 (internal citation omitted).

In addition to providing for an ILOC, the CPRI Agreement expressly and unambiguously provides for Labantschnig to procure a line of credit up to $1.5 million to meet Royal Gate's immediate short-term credit needs, thus the Personal Guaranty applies to any indebtedness incurred from that line of credit. As the trial court stated, although Alizadeh may have credibly testified that he never told Labantschnig that he would guaranty a loan from Bank for Royal

10

Gate's expenses and short-term credit needs, that is exactly what Alizadeh promised in writing to do.

Therefore, the trial court did not err by refusing to discharge Alizadeh as guarantor. *See Lehman*, 608 S.W.3d at 737 (internal citation omitted). From the evidence presented at trial, the trial court expressly found that Royal Gate was currently due and owing specific amounts on the principal, interest, and others fees to Labantschnig that were covered by the Personal Guaranty, thus Labantschnig could prevail on his claim for breach of guaranty. *See Pulaski*, 428 S.W.3d at 734 (citing *ITT Com. Fin. Corp.*, 854 S.W.2d at 382). Points One and Two are denied.

## II. Point Three—No Material Alteration Entitled Alizadeh to be Discharged from the Personal Guaranty

In Point Three, Alizadeh argues the trial court misapplied the law by not discharging him from the Personal Guaranty on the grounds that Royal Gate's repayment deadline under the CPRI Agreement was extended without his consent. Alizadeh's argument fails because there was no material alteration without his consent. Alizadeh signed a continuing guaranty authorizing and waiving notice of the change. By signing the Personal Guaranty, Alizadeh consented to future liability incurred under the CPRI Agreement, which authorized continuing payments until Royal Gate's debt to Labantschnig was paid in full.

In support of his argument, Alizadeh correctly states the general rule that "any material alteration of the guarantor's obligation under the guaranty contract will discharge the guarantor . . . unless the guarantor has consented to such alteration." *Id.* at 732 (quoting *Lemay Bank & Trust Co. v. Lawrence,* 710 S.W.2d 318, 322 (Mo. App. E.D. 1986)). Under the general rule, extension of the repayment deadline for the guaranteed debt may constitute a material alteration of the guaranty if the extension enlarges or lessens the guarantor's liability. *DeCota v. J.E.M. Dev. Corp.*, 908 S.W.2d 884, 886 (Mo. App. S.D. 1995) (internal quotation omitted). A

11

guarantor who did not consent to a material alteration is entitled to be discharged from his obligations under the guaranty. *Pulaski*, 428 S.W.3d at 732 (citing *Lemay*, 710 S.W.2d at 322); *DeCota*, 908 S.W.2d at 886 (citing *First State Bank v. Benson*, 613 S.W.2d 888, 891 (Mo. App. W.D. 1981)).

In this case, Royal Gate's repayments to Labantschnig under the CPRI Agreement were extended four months past the original deadline. In a meeting between Kelly, Alizadeh, and Labantschnig, Kelly explained that Royal Gate needed more time to repay Labantschnig after closing the first dealership and that they would repay him after closing the second dealership. Although the interest rate was unchanged, Alizadeh maintains the accrual of four months of additional interest materially altered his liability under the Personal Guaranty without his consent, requiring the trial court to discharge him from his guaranty. Given the terms of the Personal Guaranty and incorporated CPRI Agreement, we disagree. As will be shown in the following analysis, Alizadeh failed to show that the extension of Royal Gate's repayment deadline modified his liability in a manner inconsistent with the terms of the Personal Guaranty or incorporated CPRI Agreement.

Fatal to his appeal, Alizadeh ignores the continuing guaranty language in the Personal Guaranty. "A continuing guaranty is a type of guaranty agreement in which the parties contemplate guaranteeing a series of future debts or transactions, as opposed to a single debt or transaction." *Pulaski*, 428 S.W.3d at 733 (quoting *Rheem Mfg. Co. v. Progressive Wholesale Supply Co.,* 28 S.W.3d 333, 339 (Mo. App. E.D. 2000)). "Under a continuing guaranty, the guarantor agrees to be secondary obligor for all future obligations of the principal obligor to the obligee." *Id.* (citing *Rheem Mfg.*, 28 S.W.3d at 339). In this way, a continuing guaranty preauthorizes changes to the underlying debt agreement that may enlarge or lessen the

12

guarantor's liability and establishes the guarantor's consent thereto by bringing those changes into the scope of the guaranty agreement. *See id.*; *see also* 38 AM. JUR. 2D Guaranty § 70 (2024) ("If the guaranty contract contains a provision which contemplates or authorizes in advance a change in the terms of the principal contract, a change within the scope of that authorization does not discharge the guarantor."); 38A C.J.S. Guaranty § 99 (2024) ("[W]here the guaranty is of a continuing nature and does not limit or restrict the period of credit, any reasonable change as to the length of the credit will not relieve the guarantor from liability unless the extended period materially changes the contract of guaranty."). Missouri law recognizes that a continuing guaranty may preclude application of the general rule by authorizing in advance the alleged material alteration. *See Pulaski*, 428 S.W.3d at 733–34; *Martin*, 104 S.W.3d at 788; *DeCota*, 908 S.W.2d at 886–87; *Boatmen's Nat. Bank of St. Louis v. Nangle*, 899 S.W.2d 542, 545–46; *Boatman's*, 721 S.W.3d at 79–80; *LeMay*, 710 S.W.2d at 323.

Here, the Personal Guaranty signed by Alizadeh authorized in advance all liability arising under the CPRI Agreement. The Personal Guaranty is a "continuing guaranty" that extends to "payment of all liabilities and obligations . . . of any nature arising under and pursuant to the Agreement, whether now existing or hereinafter incurred, whether created directly or acquired by [Labantschnig] by assignment or otherwise, whether matured or unmatured and whether absolute or contingent." Alizadeh also expressly waived: "(a) notice of acceptance of this guaranty, (b) presentment and demand for payment of any of the liabilities or obligations of Royal Gate, (c) protest and notice of dishonor or default to the undersigned or to any other party with respect to any of the liabilities or obligations of Royal Gate, (d) all other notices to which the undersigned might otherwise be entitled, and (e) any demand for payment under this guaranty." Through these terms, the Personal Guaranty extended Alizadeh's guaranty to future obligations arising

13

under the CPRI Agreement and waived all notice of Royal Gate's risk of defaulting on the initial deadline and the ensuing four-month extension. Therefore, whether Alizadeh was notified of the extension is irrelevant, as is his argument that his silence during a meeting about the extension did not show his consent. Similarly, the Personal Guaranty's 'no-oral modification' clause is irrelevant because Alizadeh already consented in the Personal Guaranty to all future incurred liability arising under the Agreement, and waived all entitled notice, so no further showing of consent was needed for the repayment extension. *See Pulaski*, 428 S.W.3d at 732–34; *Martin*, 104 S.W.3d at 788; *DeCota*, 908 S.W.2d at 886–87; *Nangle*, 899 S.W.2d at 545–46.

The cases on which Alizadeh relies are not availing because they lacked continuing guaranties or their guaranties were otherwise distinguishable. *See Fuhrer v. Sheahan*, 857 S.W.2d 439 (Mo. App. S.D. 1993); *Citizens Bank of Smithville v. Lair*, 687 S.W.2d 268 (Mo. App. W.D. 1985); *Benson,* 613 S.W.2d 888. Neither *Fuhrer* or *Citizens Bank* had continuing guaranties or any other contract language that could be construed as binding the guarantors to changes to the guaranteed debt, thus their guarantors were appropriately discharged. *See Fuhrer*, 857 S.W.2d at 441–42; *Citizens Bank*, 687 S.W.2d at 270–71; *see also Martin*, 104 S.W.3d at 788 (distinguishing from *Citizens Bank* on the basis of a continuing guaranty); *Nangle*, 899 S.W.2d at 546 (same). Further, *Citizens Bank* had other significantly distinguishable facts. In that case, a father signed the back of his son's promissory note; after the note's original due date passed, the bank entered into a "so-called" extension agreement with the son, without the father's knowledge, which was executed after the original note's due date, had a new interest rate, was unsecured by collateral, and provided a new repayment schedule. *Citizens Bank*, 687 S.W.2d at 270–71. Unlike the father in *Citizens Bank*, Alizadeh signed a contract with a continuing guaranty, and he had actual knowledge of the repayment extension, which did not change the

14

interest rate or any other terms that materially altered the CPRI Agreement or his guaranty.  *See id.*  In *Benson*, the guaranty agreement had a continuing guaranty, but it only extended to changes in liability made before the guarantor's written notice of revocation and could not bind the guarantor to changes made after such notice was given.  *Benson*, 613 S.W.2d at 889; *see also DeCota*, 908 S.W.2d at 886–87 (distinguishing from *Benson* by finding the terms of the subject guaranty preauthorized the bank to grant extensions for repayment of the principal obligation without notice or consent of the guarantor).

As noted earlier in our discussion, although the Personal Guaranty is an independent contract, and Alizadeh did not sign the CPRI Agreement, the Personal Guaranty incorporates the CPRI Agreement by reference, thus we interpret them together to understand the scope of the Personal Guaranty.  *See Big A*, 561 S.W.3d at 35 (internal citation omitted); *Intertel*, 204 S.W.3d at 197 (internal citation omitted).  Discharge is not an available defense to an alleged material alteration of the guaranty where the change is made in accordance with an express provision in either the guaranty or in the incorporated or contemporaneously-executed underlying debt agreement.  *See Pulaski*, 428 S.W.3d at 734 (citing *Lemay*, 710 S.W.2d at 322); *Martin*, 104 S.W.3d at 788.  Here, the CPRI Agreement expressly requires Royal Gate to pay Labantschnig all accrued interest on the line of credit until the principal balance is paid in full.  The CPRI Agreement thereby contemplates Royal Gate incurring additional liability to cover interest that accrues in the event of a repayment extension.  As such, the repayment extension was not a material alteration of the CPRI Agreement because the additional interest payments at the same rate were authorized by its terms.  This, coupled with the continuing guaranty and notice waiver provisions in the Personal Guaranty, shows there was no material alteration of the Personal Guaranty without Alizadeh's consent.  *See Big A*, 561 S.W.3d at 35 (internal citation omitted);

15

*Pulaski*, 428 S.W.3d at 734 (citing *Lemay*, 710 S.W.2d at 322); *Martin*, 104 S.W.3d at 788.  As a result, Alizadeh was not entitled to be discharged from liability on his guaranty.  *See Pulaski*, 428 S.W.3d at 734 (citing *Lemay*, 710 S.W.2d at 322); *Martin*, 104 S.W.3d at 788.[2]  Finding no trial court error, Point Three is denied.

## III.    Point Four—Waiver of Guaranty Acceptance Notice

In his fourth point, Alizadeh posits the trial court erred in entering judgment against him because there was no substantial evidence that the Personal Guaranty was tendered to Labantschnig.  We deny the point because Alizadeh waived his right to notice of Labantschnig's acceptance of the Personal Guaranty.

One of the elements for a breach-of-guaranty claim is that "the defendant unconditionally delivered the guaranty to the creditor[.]"  *Pulaski*, 428 S.W.3d at 734 (quoting *ITT Com. Fin. Corp.*, 854 S.W.2d at 382); *see also BV Capital, LLC v. Hughes*, 474 S.W.3d 592, 597 (Mo. App. E.D. 2015) (finding a factual dispute about whether the guaranty was mailed to the creditor bank precluded summary judgment).  The reason for this element is that, as with other contracts, where there has been an offer to guarantee the performance of another's undertaking, there is no contract until the offer is accepted, and such acceptance has been made known to the guarantor. *Indus. Bank & Tr. Co. v. Hesselberg*, 195 S.W.2d 470, 473 (Mo. 1946).

Alizadeh maintains he never tendered the Personal Guaranty to Labantschnig or authorized Kelly to do so.  However, as Labantschnig notes, Alizadeh expressly waived his right to notice of Labantschnig's acceptance of the Personal Guaranty by its terms, hence Alizadeh's alleged lack of knowledge regarding the fact that Labantschnig accepted the guaranty is no

---

[2] We note that, contrary to Labantschnig's argument, the outcome of this point is not governed by § 400.3-605, RSMo (2016) of Missouri's Uniform Commercial Code (UCC).  Article 3 of the UCC applies only when the underlying debt agreement is a negotiable instrument.  No party has argued the CPRI Agreement is a negotiable instrument.  *See* § 400.3-104(a).

16

defense to it. Specifically, the Personal Guaranty states that Alizadeh "hereby waive[s] (a) notice of acceptance of this guaranty[.]" When a guaranty contains such a notice waiver provision, the guarantor cannot later dispute satisfaction of the element of delivery to the creditor on the grounds that he did not know about it. *Hesselberg*, 195 S.W.2d at 474 (finding substantial evidence supported the creditor's acceptance of offer and reliance thereon despite the guarantors not being notified of the acceptance where the guaranty contained a provision waiving notice of acceptance of the guaranty). Accordingly, Alizadeh's argument has no merit.

Nevertheless, we note the record contains ample evidence that this element was met. Even if the CPRI Agreement between Labantschnig and Royal Gate was signed before Alizadeh signed the Personal Guaranty later the same day, Labantschnig testified that he would only follow through with acquiring the loan from Bank to help Royal Gate if said debt was personally guaranteed. *See Don L. Tullis & Assocs., Inc. v. Gover*, 577 S.W.2d 891, 897 (Mo. App. S.D. 1979) (internal quotation omitted) ("Although the guaranty promise may have been made at a time subsequent to the creation of the principal obligation, the guaranty promise is founded upon a consideration if the promise was given as the result of previous arrangement, the principal obligation having been induced by or created on the faith of the guaranty."). The record shows Labantschnig accepted the Personal Guaranty and acted in reliance on it by procuring a line of credit from Bank for $1.5 million only two days after Alizadeh signed the Personal Guaranty. *See Hesselberg*, 195 S.W.2d at 474. Additionally, although we find no notice was required under the terms of the Personal Guaranty, the trial court made findings of fact indicating Alizadeh had constructive notice of Labantschnig's acceptance of the Personal Guaranty, as the record showed Alizadeh was aware of the line-of-credit funds flowing into Royal Gate's

17

operating account that were used to pay operating expenses. *See Lehman*, 608 S.W.3d at 737 (internal citation omitted). Point Four is denied.

## IV. Point Five—Consideration

In Point Five, Alizadeh alleges the trial court erred because there was no substantial evidence that the Personal Guaranty was supported by consideration. We deny the point because the terms of the Personal Guaranty established prima facie evidence of consideration, and Labantschnig did not need to show the Personal Guaranty directly benefitted Alizadeh.

"A guaranty is a contract that must be supported by consideration." *Kansas City Live Block 125 Retail, LLC v. Bhakta*, 476 S.W.3d 326, 330 (Mo. App. W.D. 2015) (internal citations omitted). Prima facie evidence of consideration may be found in the terms of the guaranty itself. *Id.* (internal citations omitted). A guaranty's recital of consideration establishes a rebuttable presumption that "is sufficient to support the guaranty unless the presumption is overcome to the satisfaction of the trial court by acceptable and persuasive evidence to the contrary." *Id.* (internal citation omitted).

Here, the Personal Guaranty states:

> For and in consideration of the premises, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce [Labantschnig] to perform its obligations hereunder, the undersigned, jointly and severally, do hereby personally guaranty to [Labantschnig] the payment of all liabilities and obligations of Royal Gate to [Labantschnig] and Bank of any nature arising under and pursuant to the [CPRI] Agreement.

The language of the Personal Guaranty thus establishes prima facie evidence of consideration. *See id.*

Alizadeh recognizes that the terms of the Personal Guaranty established a presumption of valid consideration, but he contends he successfully rebutted it with contrary evidence that Bank did not rely on the guaranty to extend credit to Labantschnig. However, even setting aside the

standard of review requiring us to disregard contrary evidence, Alizadeh misstates the circumstances of this case. *See id.* (noting an argument challenging the trial court's resolution of disputed evidence of a guaranty's consideration overlooks the standard of review for a court-tried case). This was not a situation in which a guarantor directly guaranteed a borrower's loan from a bank in order to protect the bank from loss. In the guaranteed CPRI Agreement, Labantschnig was Royal Gate's creditor. The Personal Guaranty was not obtained at Bank's prompting but **at Labantschnig's**. Through the CPRI Agreement, Royal Gate induced its employee Labantschnig to borrow money from Bank in order to loan to Royal Gate for its short-term credit needs. Labantschnig only agreed to the procure the funds if Royal Gate's repayment was personally guaranteed by Kelly and Alizadeh. Therefore, Alizadeh's argument that there was no evidence of Bank's reliance on the Personal Guaranty is irrelevant.

We also reject Alizadeh's alternative argument that there was no consideration because he received no benefit from the Personal Guaranty or CPRI Agreement. A guarantor does not need to receive any benefit from the guaranty (here, the Personal Guaranty) or underlying debt agreement (here, the CPRI Agreement) in order for the guaranty to be supported by valid consideration. *Id.* (internal citation omitted); *United Sav. & Loan Ass'n v. Lake of Ozarks Water Festival, Inc.*, 805 S.W.2d 350, 353 (Mo. App. S.D. 1991) (citing *Gover*, 577 S.W.3d at 896); *Mercantile*, 648 S.W.2d at 923 (citing *Gover*, 577 S.W.3d at 896; *Hesselberg*, 195 S.W.2d at 474). Consideration may be, but does not need to be, found between the guarantor and creditor. *Bhakta*, 476 S.W.3d at 330 (internal citation omitted). "[A] guarantor need not have an interest in the debtor for a guaranty to be enforceable." *Id.* at 331 (citing *Mercantile,* 648 S.W.2d at 924). "Benefit to the debtor or detriment to the creditor constitutes sufficient consideration to support a guaranty." *Id.* at 330 (citation omitted). "Benefit to a third person, a detriment to a

19

promisee, or a change in the promisee's relations in consequence of the promise is sufficient consideration to render the promisor obligated under a guaranty agreement." *United Sav. & Loan*, 805 S.W.2d at 353 (citing *Gover*, 577 S.W.3d at 896). Here, consideration could adequately be supported by a benefit to Royal Gate or a detriment to Labantschnig, and, indeed, Labantschnig provided $1.5 million to Royal Gate, benefitting the dealership business. *See id.* Additionally, though not necessary to resolve the appeal, we are not persuaded by Alizadeh's argument that he received no benefit as he was a shareholder and owner of Royal Gate, which benefited from Labantschnig's loan, even though Labantschnig testified he did not think that putting any of those funds towards operating costs ultimately benefited Royal Gate. Point Five is denied.

## V.      Point Six—Attorneys' Fees

In his final point, Alizadeh asserts the trial court erred in awarding Labantschnig attorneys' fees on his breach-of-guaranty action because the Personal Guaranty's fee provision applied only to Royal Gate's liabilities and obligations, not Alizadeh's. We find the plain language of the Personal Guaranty shows the fee provision extends to Alizadeh in this action.

"To successfully challenge a trial court's award of attorney[s'] fees on appeal in Missouri, a party must show that the award is an abuse of discretion." *Rand Constr. Co. v. Caravan Ingredients, Inc.*, 662 S.W.3d 44, 57 (Mo. App. W.D. 2022) (internal citation omitted). A trial court abuses its discretion if it erroneously interprets a fee provision in a contract. *See id.* "If a contract provides [for] the payment of attorney[s'] fees and expenses incurred in the enforcement of a contract provision, the trial court must comply with the terms of the contract and award them to the prevailing party." *Id.* (internal quotation omitted).

As stated at the outset of our discussion, "it is well-settled that the liability of a guarantor is to be strictly construed according to the terms of the guaranty agreement[.]" *Ulreich*, 876 S.W.2d at 728 (internal citations omitted). "The terms of a guaranty 'are to be understood in their plain and ordinary sense, when read in the light of the surrounding circumstances and the object intended to be accomplished.'" *Id.* (internal quotation omitted). Fee provisions in guaranties, and in incorporated or contemporaneously-executed underlying debt agreements, may make guarantors liable for fees incurred directly against them or incurred by creditors against the underlying debtor. *See id.* at 730 (holding a guarantor liable for a creditor's attorneys' fees incurred when recovering on the guaranteed debt because, although the guaranty was silent as to attorneys' fees, such fees were covered by the underlying debt agreement).

As reprised earlier, the Personal Guaranty contains the following provision:

> The undersigned shall reimburse [Labantschnig], to the extent that such reimbursement is not made by Royal Gate, for all ILOC Draws, expenses (including counsel fees), and other losses incurred by [Labantschnig] in connection with any liabilities or obligations of Royal Gate under the Agreement.

In light of this provision, we disagree with Alizadeh's interpretation that the Personal Guaranty does not provide for attorneys' fees on Labantschnig's action for breach of guaranty. The Supreme Court of Missouri has interpreted "in connection with" as "to have a relationship with," and enforced the terms of a loan made in connection with a sale under the Missouri Merchandising Practices Act. *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 414 (Mo. banc 2014). Labantschnig's right to recover against Alizadeh on his guaranty is certainly related to Labantschnig's attempt to be made whole on losses incurred in connection with Royal Gate's liabilities and obligations to him under the CPRI Agreement. *See id.* Therefore, the trial court did not err in awarding attorneys' fees. *See Rand Constr. Co.*, 662 S.W.3d at 57 (internal citation omitted); *see also LeMay*, 710 S.W.2d at 324. Point Six is denied.

21

## VI.    Labantschnig's Motion for Appellate Attorneys' Fees

During the pendency of this appeal, Labantschnig moved for appellate attorneys' fees, and we took the motion with the case.  We found in Point Six above that the fee provision in the Personal Guaranty provides for attorneys' fees against Alizadeh in this action, and we are affirming the trial court's judgment in Labantschnig's favor on all points.  *See Lehman*, 608 S.W.3d at 741 (noting "[o]ur court may award appellate attorney fees 'if they are based on a written agreement that is the subject of the issues presented on appeal'").  Labantschnig has thus prevailed on appeal and is entitled to an award of attorneys' fees against Alizadeh.  *See id.*  We grant the motion.

Although appellate courts have the "authority to allow and fix the amount of [attorneys'] fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested."  *Id.* (internal quotation omitted).  Because the trial court is in a better position to determine a reasonable award of attorneys' fees, we remand the cause to the trial court.  *See id.*; *Pulaski*, 428 S.W.3d at 734 (internal citation omitted).

Conclusion

The judgment of the trial court is affirmed.  We remand the cause to the trial court for determining an appropriate award of Labantschnig's attorneys' fees.

_____
Rebeca Navarro-McKelvey, J.

Lisa P. Page, P.J., and
Kurt S. Odenwald, J., concur.

22